# EXHIBIT 9

```
 1       IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF NEW YORK
 2              MANHATTAN DIVISION
 3
    DAVIDSON HENAO, MIGUEL     )
 4  MERO, OMOBOWALE AVOSEH,    )
    RASHEEM MARTIN and SHAWN   )
 5  WILLIAMS, for themselves and )
    and all others similarly   )
 6  situated.                  )
                               )
 7      Plaintiffs,            )
                               )
 8       -vs-                  ) Cause No. 19-cv-10720
                               ) (LGS) (BCM)
 9  PARTS AUTHORITY, LLC,      )
    PARTS AUTHORITY, INC.,     )
10  YARON ROSENTHAL, NORTHEAST )
    LOGISTICS d/b/a "Diligent  )
11  Delivery Systems," et al.  )
                               )
12      Defendants.            )
13
14      DEPOSITION OF DARL PETTY
15   TAKEN ON BEHALF OF THE PLAINTIFFS
16         ON MAY 14, 2021
17
18
19        Reported by
          Darla D. Thompson
20     Missouri CCR Number 553
       Illinois CSR Number 084-004136
21 _____
22      Bi-State Reporting, Inc.
23        1204 Seasons Drive
         Godfrey, Illinois  62035
24        1204 Seasons Dr
   Missouri (314)805-6578    Illinois (618)466-2039
25
```

```
 1       IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF NEW YORK
 2              MANHATTAN DIVISION
 3  DAVIDSON HENAO, MIGUEL     )
    MERO, OMOBOWALE AVOSEH,    )
 4  RASHEEM MARTIN and SHAWN   )
    WILLIAMS, for themselves and )
 5  and all others similarly   )
    situated.                  )
 6                             )
        Plaintiffs,            )
 7                             )
         -vs-                  ) Cause No. 19-cv-10720
 8                             ) (LGS) (BCM)
    PARTS AUTHORITY, LLC,      )
 9  PARTS AUTHORITY, INC.,     )
    YARON ROSENTHAL, NORTHEAST )
10  LOGISTICS d/b/a "Diligent  )
    Delivery Systems," et al.  )
11                             )
        Defendants.            )
12
13  Deposition of Darl Petty, taken to be used in an
14  action pending in the United States District Court,
15  of the State of New York, pursuant to agreement
16  between counsel, under the provision of Rule 33.3 of
17  the Rules of Civil Procedure, taken on 14th day of
18  May 2021, between the hours of eight o'clock in the
19  forenoon and six o'clock in the afternoon of that
20  day via teleconference in the City of New York,
21  State of New York, before Darla D. Thompson, CCR, in
22  a certain cause now pending in the United States
23  District Court of New York, wherein Davidson Henao,
24  et al. Are Plaintiffs and Parts Authority, LLC, et
25  al. Are Defendants; taken on behalf of Plaintiffs.
```

```
 1
 2              A P P E A R A N C E S
 3
 4  WEINHAUS & POTASHNICK
    11500 Olive Blvd., Suite 133
 5  St. Louis, Missouri  63141
    By:  Mark A. Potashnick
 6
 7  FOR THE DEFENDANT
 8  DORF & NELSON LLP
    555 Theodore Fremd Avenue
 9  Rye, New York  10580
    By:  Andrew P. Marks, Esq.
10
11  ABRAMS FENSTERMAN
    160 Linden Oaks, Suite E
12  Rochester, New York  14625
    By:  Sharon Stiller, Esq.
13  Also Present:  Maurice Bresenhan, Esq.
14         -o0o-
15          I N D E X
16                                    PAGE
17  Direct Examination by Mr. Potashnick    4
18         -o0o-
19         E X H I B I T S
20
    PLAINTIFF'S
21  EXHIBIT    DESCRIPTION            PAGE
22   1      Master Client Services Agreement  22
23   2      Contractor Agreement              27
24   3      Arizona Logistics Interrogatory   36
25          Responses
```

```
 1          MR. MARKS:  Mark, can I say that
 2   Maurice Bresenhan is present with
 3   Mr. Petty.
 4          MR. POTASHNICK:  And who is
 5   Mr. Bresenhan?
 6          MR. MARKS:  Mr. Bresenhan is a lawyer
 7   for Diligent Delivery systems.
 8      I would also like to, for the record,
 9   reserve our right to review and sign the
10   deposition.  One other thing, if I may,
11   for the record, this is a 30(b)6
12   deposition of Arizona Logistics and BBB
13   Logistics.  We are presenting Mr. Petty to
14   testify on behalf of both entities.
15          DARL PETTY,
16  of lawful age, being first duly sworn to tell the
17  truth, the whole truth, and nothing but the truth,
18  deposes and says on behalf of the Plaintiffs.
19          DIRECT EXAMINATION
20  QUESTIONS BY MR. POTASHNICK:
21      Q.  Mr. Petty, my name is Mark Potashnick.
22  I'm an attorney.  I represent the plaintiffs in a
23  claim filed against Arizona Logistics, BBB Logistics
24  Northeast Logistics, Michigan Logistics, Parts
25  Authority and some individuals in the United States
```

## Page 5

District Court for the southern district of
New York.
   I am going to ask you a series of
questions. If you don't understand the question,
just ask and I'll be glad to explain or rephrase, as
necessary.
   A couple of ground rules. I ask that you
answer with a verbal response, such as a yes or no
rather than a physical gesture such as a nod or
shake of the head so that we can get down a clean
transcript. I ask that you use terms such as yes
and no, where appropriate, rather than uh-huh and
huh-uh because the uh-huhs and huh-uhs are sometimes
difficult to interpret when you see them later in a
transcript.
   I'll do my best today to let you finish
your answers in full before I begin my next
question. And I would ask that you try to do the
same, let me ask my questions in full before you
begin your answer. That way we wouldn't be talking
over each other, and the court reporter will be able
to take down a clean and accurate transcript.
   If you need a break, that's fine. Just
ask. I just ask that a break not be requested
between a question and answer.

## Page 6

   Do you understand these instructions?
   A. Yes.
   **Q. Thank you. Please state your full name for the record.**
   A. Darl Petty.
   **Q. Mr. Petty, by whom are you employed?**
   A. Norlyn Enterprises, Inc.
   **Q. What is your business address?**
   A. 9200 Derrington Road, Houston, Texas 77064.
   **Q. How long have you been employed by Norlyn Enterprises?**
   A. It will be eight years in June.
   **Q. What is your position of employment with Norlyn Enterprises?**
   A. Chief financial officer.
   **Q. What did you do to prepare for today's deposition?**
   A. I spoke with Drew Marks, Maurice Bresenhan, attorney. I read the answers to the interrogatories that we were provided recently. I spoke with a couple of the employees, that I work alongside with here, to check on a couple of things related to some of the things that came out of the discussion with the attorneys. I spoke with a

## Page 7

couple of employees in the field; namely, Jerry
Curcio and Tom Baker. And I read other documents,
my deposition from a couple of years ago and some
other things that were prompted by my attorneys to
kind of refresh and review in case it became
relevant today.
   **Q. You said you spoke with some employees here. By "here," did you mean at your office?**
   A. Yes. In Houston. I spoke with Camille Harvey, Gina Volking, Carlos Navarro briefly just about his deposition, Doak Medchill, briefly.
   **Q. What is Camille Harvey's position?**
   A. She is the manager of our ICR department, which is independent contractor resources.
   **Q. Who is Camille Harvey employed by?**
   A. Norlyn Enterprises.
   **Q. You said Gina Volking; did I get that right?**
   A. Correct.
   **Q. How do you spell Mrs. Volking's last name?**
   A. V-O-L-K-I-N-G.
   **Q. What is Mrs. Volking's position of employment?**
   A. She's the manager of our accounting -- our primary accounting processes.

## Page 8

   **Q. Who is Ms. Volking employed by?**
   A. Norlyn Enterprises.
   **Q. You mentioned Carlos Navarro?**
   A. Yes.
   **Q. What is his position?**
   A. He's chief information officer.
   **Q. Who is Mr. Navarro employed by?**
   A. Norlyn Enterprises.
   **Q. You said Doak Medchill. Is that D-O-A-K?**
   A. Correct. It's not Mitchell. It's Medchill, M-E-D-C-H-I-L-L.
   **Q. What is Mr. Medchill's position of employment?**
   A. Chief operating officer of Norlyn Enterprises.
   **Q. Who is Mr. Medchill's employer?**
   A. Norlyn Enterprises.
   **Q. You said you spoke with employees in the field. Who were you referring to?**
   A. Tom Baker and Jerry Curcio.
   **Q. What is Tom Baker's position of employment?**
   A. He's general manager of BBB Logistics, Inc.
   **Q. Who is Mr. Baker employed by?**

1  A. BBB Logistics, Inc.
2  Q. What is Jerry Curcio's position of
3  employment?
4  A. He's general manager of Northeast
5  Logistics, Inc.
6  Q. I take it he is employed by Northeast
7  Logistics, Inc.?
8  A. He is.
9  Q. You said you reviewed your deposition from
10 a couple of years ago; did I get that right?
11 A. Yes.
12 Q. Was that in the Department of Labor
13 litigation against Arizona Logistics?
14 A. I believe it was, yes.
15 Q. Did you find any testimony in there that
16 you found to be incorrect or that you wanted to
17 change?
18     MR. MARKS: Objection; that goes
19     beyond the scope of this deposition.
20 Q. (By Mr. Potashnick) Your answer, please.
21     MR. MARKS: You don't have to answer
22     that. It's beyond the scope of this
23     deposition.
24     MR. POTASHNICK: Just to be clear,
25     are you instructing the witness not to

1  answer that?
2     MR. MARKS: Yes. It's beyond the
3     scope of what is permitted to ask in this
4     deposition. It is not a 30(b)6 of BBB or
5     Arizona Logistics. And you are asking him
6     something that is unrelated to this case.
7     So, yes, it's beyond to scope and I am
8     directing him not to answer that.
9  Q. (By Mr. Potashnick) You mentioned another
10 category of documents that you looked at to prepare
11 for today deposition. What were those documents?
12 A. A list of past employees of Arizona and
13 BBB. Some responses to interrogatories of when
14 Larry Brown answered some questions. A Master
15 Client Services Agreement, a Contractor Agreement
16 from 2017, I think, is what it was called. And,
17 then, I didn't really read them all but a bunch of
18 just corporate organizational documents. You know,
19 articles of incorporation and things that were
20 established and legal entities. I think that's
21 everything.
22 Q. Other than the deposition a couple of
23 years ago in the D.O.O. matter in Arizona Logistics,
24 have you been deposed or given testimony under oath?
25 A. Only one time prior to that.

1  Q. What kind of matter was that?
2  A. It was a company completely unrelated to
3  Diligence. A construction company that I have a
4  minority equity interest in. And we sued our former
5  attorney for theft, and his attorney deposed us in
6  that.
7  Q. What is your highest level of education
8  completed?
9  A. A bachelors degree.
10 Q. Where did you get that?
11 A. Texas A&M University.
12 Q. About what year?
13 A. 1992.
14 Q. What is your bachelors in?
15 A. Finance.
16 Q. What are your day-to-day duties as the CFO
17 or Norlyn Enterprises?
18 A. Of Norlyn Enterprises? Analyzing
19 financial performance, preparing financial
20 statements, contributing to a wide variety of
21 operational decisions regarding customers and
22 internal processes and so forth. Interfacing with
23 our bank and other lenders, pursuing acquisitions.
24 Those are the primary things.
25 Q. Are you also the CFO of BBB Logistics?

1  A. Yes.
2  Q. Are you also the CFO of Arizona Logistics,
3  Inc.?
4  A. Yes.
5  Q. Are you also the CFO of Northeast
6  Logistics?
7  A. Yes.
8  Q. Are you also the CFO of Michigan
9  Logistics?
10 A. Yes.
11 Q. What are your duties as the CFO of BBB
12 Logistics?
13 A. To prepare their financial statements.
14 Occasionally, contribute to discussions about, you
15 know, just the basic business, the sales growth and
16 some -- very rarely, but sometimes random
17 operational things that I'll be drawn into by other
18 people that are working on things. That's kind of
19 it, really.
20 Q. What are your duties as the CFO of Arizona
21 Logistics, Inc.?
22 A. The same. Just preparing their financial
23 statements and, you know, as CFO, contributing to,
24 you know, group discussions of whatever matters are
25 going on, dealing with legal issues for both, I

## Page 13

should add. Such as this. Obviously, I was, specifically, requested to do this. So I would have to include that in the list.

Q. What are your duties as CFO of Northeast Logistics?

A. The same as the other two. Preparing financial statements. Getting involved, when needed, with optional decisions and discussions that may be being made about whatever is going on at the moment. And dealing with legal issues, if I am asked to help out on that.

Q. What are your duties as CFO or chief financial officer of Michigan Logistics?

A. The same as the others. Preparing their financial statements, interfacing with local management or other people here. If there's a decision to be made that they would like me to help make or analyze or so forth. And dealing with legal matters like this, when I'm needed.

Q. Do you have any role with respect to pay practices of delivery drivers?

A. Not in deciding how much drivers are paid, but you could say I have a role in the sense that if I analyze their financial statements and I see some information that leads me to believe they are paying

## Page 14

drivers too much or if I know there is business that they are not able to obtain because they can't get drivers, then I might get involved with the discussion. But, generally, that would be somebody else bringing it to me rather than me finding it.

Q. Do those discussions occur with respect to BBB Logistics?

A. Yes. The same with all the others.

Q. Just so the record is clear, when you say all the others, you are referring to Arizona Logistics, Northeast Logistics, and Michigan Logistics?

A. Correct. My role with each of those is pretty identical.

Q. Who determines how much delivery drivers should be paid at your company?

A. The general managers of each respective business unit. So at BBB, it would be Tom Baker and his direct report Wendi Varner. And, then, at Northeast, it would be Jerry Curcio.

MR. MARKS: I know I missed this, but let me object to the form because your question was "at your company." "Company" is not a client term that we are using.
If you mean the four entities,

## Page 15

Northeast, Arizona, Michigan and BBB, then that's fine. Otherwise, please define the term company that you talked about.

Q. (By Mr. Potashnick) If I refer to your office as the home office, will you know what I mean?

A. Norlyn, yes. That's fine.

Q. Does anybody at Norlyn oversee decisions about how much delivery drivers should be paid?

A. The operation team and the sales department both play a role in that. But the general manager -- you know, they do it alongside -- whichever managers are at whichever company that they are in discussions with. BBB would be different people than Northeast Logistics.

Q. If I refer to BBB Logistics, Arizona Logistics, Northeast Logistics and Michigan Logistics, collectively, as the operating companies, is that acceptable to you? Will you know what I mean?

A. Yes.

Q. Who at Norlyn were you referring to that has a role in determining how much the delivery drivers of the operating companies are paid?

MR. MARKS: Object. This misstates

## Page 16

his prior testimony.
You can go ahead and answer.

A. The operations department, which is led by Doak Medchill, the chief operating officer, and a handful of people there. You know, Mark Stevens, Andy Van, upon what's happening. And then the sales department, you know, in a way, Scott Bruder, would perhaps have a role in how much the drivers would be paid, based on what we think the client will pay for such -- for delivery services.

Q. You said Doak Mudchell, and he was mentioned earlier. You said Mark Stevens. What is Mark Stevens' position?

A. I think his title is national director of operations, but he's really more of an analyst, analytical operations guy that looks at data and helps figure out costs. And using logistics data, he figures out what the cost of providing delivery services would be. That's a big part of what he does.

Q. Who is Mark Stevens employed by?

A. Norlyn Enterprises.

Q. You said -- did I get it right, Andy Van?

A. Yes.

Q. How do you spell that last name?

Page 17

```
 1      A.  His real name is, like, VanHaverbeke.  I
 2   could guess how to spell it.  I just call him Andy
 3   Van.
 4      Q.  Can you give us your best estimate of the
 5   spelling of his last name?
 6      A.  I think it's V-A-N-H-A-V-E-B-E-K-E.  I
 7   probably butchered that.
 8      Q.  V-A-N-H-A-V-B-E-K-E?
 9      A.  Yes.  I think that's it.
10      Q.  Is the H capitalized as a separate word?
11      A.  I don't think it is, but I'm not sure.
12      Q.  What is Andy VanHaverbeke's position of
13   employment?
14      A.  He is executive vice president over
15   national operations.  I'm not sure if that's his
16   exact title, but he is employed by Norlyn
17   Enterprises.
18      Q.  After Andy VanHaverbeke, did you mention
19   any other persons when you were talking about people
20   in Norlyn's operations department that have a role
21   in delivery driver pay?
22      A.  No, I did not.
23      Q.  You mentioned Scott Bruder in the sales
24   department.  What is Scott Bruder's position of
25   employment?
```

Page 18

```
 1      A.  That's Bruder, B-R-U-D-E-R.
 2      Q.  Thank you.
 3      A.  He's, basically, just a sales guy.  He
 4   kind of/sort of is the sales department head, but we
 5   don't really have a sales department, so.
 6      Q.  Who is Scott Bruder employed by?
 7      A.  Norlyn Enterprises.
 8      Q.  Who do you report to?
 9      A.  Larry Brown.
10      Q.  Who else -- I'm sorry.  What is Larry
11   Brown's position of employment?
12      A.  He's president and chief executive officer
13   of Norlyn Enterprises.
14      Q.  Is Mr. Brown also the president and CEO of
15   the operating companies we've talked about:  BBB
16   Logistics, Arizona Logistics, Michigan Logistics and
17   Northeast Logistics?
18      A.  He is.
19      Q.  Does Mr. Brown report to anybody or is he
20   the top of the hierarchy at Norlyn?
21      A.  He is the top of hierarchy.
22      Q.  Is Mr. Brown the top of hierarchy at the
23   operating companies?
24      A.  Yes.
25      Q.  Who else reports directly to Mr. Brown?
```

Page 19

```
 1      A.  Doak Medchill, the COO; Scott Bruder,
 2   sales; Brenda Soto, human resources.  That's
 3   really -- as far as his direct reports, that's
 4   really it.
 5      Q.  You said DeSoto?
 6      A.  Brenda Soto, S-O-T-O.
 7      Q.  Brenda Soto.  Okay.  What is Brenda Soto's
 8   position?
 9      A.  She's manager of the human resources
10   department.
11      Q.  Who is Brenda Soto employed by?
12      A.  Norlyn Enterprises.
13      Q.  Does Brenda Soto oversee human resources
14   at the operating companies we have been talking
15   about, again:  BBB Logistics, Arizona Logistics,
16   Northeast Logistics and Michigan Logistics?
17      A.  Yeah.  I wouldn't say oversee.  She
18   provides a human resources support to the managers
19   of those companies, but.
20      Q.  What kind of human resources support does
21   Brenda Soto provide to the managers of the operating
22   companies?
23      A.  Recruiting new employees.  If there's some
24   sort of a disciplinary action where a manager wanted
25   to write up an employee for something they did,
```

Page 20

```
 1   Brenda could help them with that, or a termination,
 2   for that matter, of an employee.  And facilitating.
 3   Anything in the payroll -- not the payroll but the
 4   employee profile records.  If somebody's
 5   fifth anniversary was coming up and we were going to
 6   give them a gift card or something, Brenda would
 7   probably be the person to alert everybody that their
 8   fifth anniversary was coming up.  Those sort of the
 9   things.
10      Q.  Who is over payroll of delivery drivers at
11   the operating companies?
12      A.  Well, if the drivers are contractors, we
13   don't really have a payroll.  We settle their vendor
14   payments that they are owed.  And that is a process
15   where we say -- who is over it, was that your
16   question?
17      Q.  Yes.
18      A.  So the managers, in the field, who have
19   contracted those drivers, are over -- "over" being a
20   little nebulous -- they are the ones making the
21   engagement and, thus, establishing, you know, how
22   much the drivers want to be paid and creating the
23   engagement to have the drivers paid.
24          Who, actually executes the payment and
25   makes sure the funds get into the drivers' account
```

## Page 21

1 would be the accounting department; specifically
2 managed and overseen by Gina Volking, who I
3 mentioned earlier.
4  Q. That's the accounting department at Norlyn
5 Enterprises or the home office?
6  A. Yes, Norlyn Enterprises.
7  Q. Is Gina Volking over that task of making
8 sure that the delivery drivers are paid for all the
9 operating companies that we have been talking about?
10  A. She is, yes.
11  Q. Who reports to you?
12  A. Fe Cruz. That's F-E. Last name C-R-U-Z.
13 That's, technically, my only direct report.
14  Q. Is Fe a woman?
15  A. Yes.
16  Q. What is Fe's position of employment?
17  A. Controller.
18  Q. Who is Fe employed by?
19  A. Norlyn Enterprises.
20  Q. Does anybody report to you, indirectly?
21  A. Yeah.
22   MR. MARKS: I'll object to the form
23   of the question.
24   Go ahead.
25  A. I wouldn't say report to me, indirectly,

## Page 22

1 but, you know, various people come to me for -- to
2 talk about the business.
3  Q. Do you supervise anybody other than
4 Fe Cruz?
5  A. No.
6   (The Court Reporter marked Plaintiff's
7 Exhibit 1.)
8  Q. (By Mr. Potashnick) Let's take a look at a
9 document that I provided to your counsel yesterday
10 called Master Client Services Agreement. I believe
11 it's one of the documents that you mentioned looking
12 at in preparation for today's deposition.
13  A. Which document? The Master Service
14 Agreement or the Contract Agreement for 2017.
15  Q. Master Client Services Agreement.
16   Mr. Petty, do you have that document in
17 front of you?
18  A. Yes.
19  Q. I've seen two versions of this document.
20 Does the version you have, have numbers stamped at
21 the top, Case 2:16-cv-04499-DLR?
22  A. Yes.
23  Q. Good. Do you recognize this document?
24  A. Yes.
25  Q. Can you identify that for us, please?

## Page 23

1  A. It's a Client Services Agreement with
2 Parts Authority.
3  Q. It says, "This agreement is made and
4 entered into the 30th day of August 2010, by and
5 between Diligent Delivery Systems, hereinafter
6 Diligent, whose corporate office is located at" and
7 so forth."
8   Did you see where I read from, at the top?
9  A. Yes.
10  Q. Is Diligent Delivery Systems a corporation
11 or is that a fictitious name?
12  A. It's an assumed name.
13  Q. Is it an assumed name used by all the
14 operating companies that we have been talking about
15 today?
16  A. Yes.
17  Q. Which of the operating agreements or all
18 of them entered into this contract as Diligent
19 Delivery Systems?
20  A. I believe, at this time when this was
21 written in 2010, it would be Northeast Logistics,
22 Inc.
23  Q. Did other operating companies later join
24 this agreement?
25  A. I'm not certain if they joined this

## Page 24

1 agreement or, like I see here, there is an addendum
2 written. It looks like it adds Arizona Logistics.
3 So I guess they joined.
4  Q. When you refer to the addendum, can you
5 given me the page number by the numbers in the lower
6 right-hand corner, please.
7  A. BA 0411.
8  Q. Did Michigan Logistics ever enter this or
9 ever join this Master Client Services Agreement?
10  A. I don't know.
11  Q. Did BBB Logistics ever join this Master
12 Client Services Agreement?
13  A. I don't see them on here, so I don't know.
14  Q. Who negotiated this Master Client Services
15 Agreement on behalf of Diligent?
16  A. I didn't join Norlyn until 2017, so I
17 wouldn't know for sure. But since it is signed by
18 Scott Bruder, I would assume he had a hand in it.
19  Q. Do you know if Larry Brown participated in
20 negotiating this Master Client Services Agreement?
21  A. I do not. I wasn't here.
22   MR. POTASHNICK: While I'm thinking
23   about it, let's call this Master Client
24   Service Agreement, Exhibit 1, please,
25   Darla.

1    A.  Exhibit 1, okay.
2    Q.  (By Mr. Potashnick) Did you look into
3  whether Larry Brown looked into negotiating this
4  Master Client Services Agreement as part of your
5  preparation for today's deposition?
6    A.  I did not.
7    Q.  In 2010, did Scott Bruder report to Larry
8  Brown?
9    A.  He did.
10   Q.  Other than Scott Bruder, do you know who,
11 on behalf of Diligent Delivery Systems, participated
12 in the negotiation, review or approval of this
13 Michigan Client Services Agreement?
14   A.  I don't know, but I would assume Jerry
15 Curcio and perhaps Tony Carter.
16   Q.  What is Tony Carter's position?
17   A.  He's no longer with Norlyn, but he was a
18 chief operating officer.  Actually, you know what,
19 I'm not even sure he was here in 2010, but he may
20 have been.  It was before my time.
21   Q.  Did he hold the same position as
22 Mr. Medchill but before Mr. Medchill?
23   A.  Correct.
24   Q.  You mentioned Jerry Curcio.  What was his
25 position in 2010?

1    A.  General manager of Northeast Logistics,
2  Inc.  Again, before my time, but I'm pretty sure
3  that he was here then, that he was general manager
4  then of Northeast Logistics.
5    Q.  Do you know whether Mr. Curcio was
6  involved in the negotiation of this Master Client
7  Services Agreement, or is that just an assumption on
8  your part?
9    A.  It's an assumption.  I don't know.  Well,
10 I guess, I'm assuming everything because I literally
11 didn't work with these guys in 2010, but I would
12 presume that Jerry would be involved in negotiating
13 the terms and pricing of the agreement but probably
14 not the language in the agreement.  I'm assuming
15 that, I guess.
16   Q.  When this addendum, in which Arizona
17 Logistics joined, the Master Client Services
18 Agreement, was negotiated or approved, who, for
19 Diligent Delivery Systems, negotiated or approved
20 the addendum?
21   A.  Again, it was dated 2010 also, and even if
22 it wasn't, you know, I wouldn't have been involved.
23 I could assume that Scott Bruder negotiated it and
24 probably ran it by Tony Carter, and Tony might have
25 ran it by Larry.  I don't know.

1    Q.  If you look at the page Bates labeled
2  PA 0415, which is the last page of this document
3  does that give you any information about who
4  negotiated or approved the addendum for Arizona
5  Logistics?
6    A.  It's signed by Scott Bruder, so he was --
7  I guess his title there is chief sales officer.  You
8  were asking earlier.  So there you have it.
9    Q.  As of this date in 2012 shown on Bates
10 page PA 0415, did Mr. Bruder report directly to
11 Larry Brown?
12   A.  He did.  I wasn't here then, but I know he
13 did.
14   Q.  Is this Master Client Services Agreement,
15 that we marked as Exhibit 1, still in effect today?
16   A.  That, I don't know because there has been
17 a little confusion regarding this other document
18 floating around.
19   Q.  When you say this other document floating
20 around, what document are you referring to?
21   A.  I think it's called a Contractor Agreement
22 from 2017.
23   Q.  Let's make that document, the Contractor
24 Agreement, Exhibit 2.  And I would like to bring
25 that one to your attention, Mr. Petty.

1    A.  Okay.
2       (The Court Reporter marked Plaintiff's
3  Exhibit 2.)
4    Q.  (By Mr. Potashnick) Have you had a chance
5  to locate it?
6    A.  I have it in front of me.
7    Q.  Mr. Petty, can you identify this document
8  for us marked as Exhibit 2, please.
9    A.  Yeah.  Only to the extent of I'm just
10 seeing this for the first time in getting ready for
11 this process, but it's titled Contractor Agreement
12 dated September 27, 2017, between Parts Authority
13 and Diligent Delivery Systems.
14   Q.  Is this the document you were referring to
15 a moment ago when you said there is some confusion
16 about which document is in effect?
17   A.  Correct.
18      MR. MARKS:  That misstate his
19   testimony.
20      But go ahead.
21   Q.  (By Mr. Potashnick) On Exhibit 2, it says
22 that this agreement -- in the first paragraph, "This
23 agreement is made and entered on September 27, 2017,
24 by and between Parts Authority, LLC, including its
25 parents, subsidiaries and affiliates with its

Page 29

1 principal office located at 3 Dakota Drive, Suite
2 110, New Hyde Park, New York 11402, hereinafter
3 referred to as customer and Diligent Delivery
4 Systems with its principal office located at" and so
5 forth.
6     Which of the operating companies entered
7 into this agreement with Parts Authority, LLC?
8     A.  I don't know.
9     Q.  Do you know if Northeast Logistics entered
10 into this Contractor Agreement with Parts Authority?
11     A.  I do not.  I'm rereading it right now to
12 see if I can figure that out.  I do not see.  No, I
13 don't know.
14     Q.  Do you know if BBB Logistics entered into
15 this Contractor Agreement with Parts Authority?
16     A.  I do not know.
17     Q.  Do you know if Arizona Logistics entered
18 into this Contractor Agreement with Parts Authority?
19     A.  No I don't.
20     Q.  And do you know if Michigan Logistics
21 entered into this Contractor Agreement with Parts
22 Authority?
23     A.  I do not know.
24     Q.  Would you agree that some entity or
25 entities, doing business as Diligent Delivery

Page 30

1 Systems, entered into this Contractor Agreement with
2 Parts Authority?
3     A.  It appears so, yes, because it was signed
4 by Diligent, but -- the version I had wasn't signed
5 by Parts Authority.  I don't think that matters.
6 I'm assuming it was entered, that Parts Authority
7 signed it, but maybe not.  I don't know.
8     Q.  Do you know if this is a nationwide
9 contract?
10     A.  I don't know that, but I would -- yeah, I
11 don't know.
12     Q.  On page 5, it contains a signature for
13 contractor?
14     A.  Uh-huh.  Yes.
15     Q.  Is that the signature of Larry Brown?
16     A.  Yes, it is.
17     Q.  On the bottom of each page, it has,
18 "contractor initials" and it says "LB."  Is that
19 Larry Brown?
20     A.  Yeah.  I would guess so, yeah.  I don't
21 know his initials.
22     Q.  Do you know of any other contract between
23 Northeast Logistics and Parts Authority other than
24 Exhibits 1 or 2?
25     A.  No, I do not.

Page 31

1     Q.  Do you know of any other contract between
2 Michigan Logistics and Parts Authority other than
3 Exhibits 1 and 2?
4     A.  No.
5     Q.  Do you know of any other contract between
6 BBB Logistics and Parts Authority other than
7 Exhibits 1 and 2?
8     A.  No.
9     Q.  Do you know of any other contract between
10 Arizona Logistics and Parts Authority other than
11 Exhibits 1 and 2?
12         MR. MARKS:  I'll object to the form
13     of all those questions to the extent that
14     they assume there is a contract between
15     Parts Authority and any other entities
16     since there was no testimony about that.
17     But your question assumes that, and he's
18     answering this compound question, and I
19     object to it.
20     Q.  (By Mr. Potashnick) Your answer,
21 Mr. Petty?
22     A.  For Arizona, no, I wouldn't know that.
23     Q.  Is this contract, marked as Exhibit 2,
24 still in effect?
25     A.  I don't know.  I don't know if it ever

Page 32

1 went into effect.
2     Q.  Did Mr. Brown have -- was he under the
3 authority to sign agreements with Diligent's
4 customers?
5         MR. MARKS:  Object to the form.
6         You can answer the question.
7     A.  Yes.
8     Q.  (By Mr. Potashnick) Does Mr. Bruder have
9 authority to sign contracts with Diligent customers?
10     A.  Yes.
11     Q.  Who else, at Norlyn or the operating
12 companies, that we've been talking about today, has
13 authority to sign contracts with Diligent's
14 customers?
15     A.  Doak Medchill, COO.  I guess, I probably
16 have the authority.  But it's not really my
17 function.  So I've never been asked to read and
18 approve and sign a contract with a client.  I think
19 we already established Larry.  So Larry Brown.  The
20 general managers in the field.  So a general manager
21 of BBB, that's Tom Baker or Wendi Varner, his direct
22 report, could sign a contract with a client.
23     Q.  Are you familiar with the term national
24 contract or national agreement?
25     A.  Yes.

1  Q. What do the terms national agreement or
2  national contract mean to you?
3  A. Well, for -- specifically for BBB or
4  Arizona, it would mean they could do business with
5  the client who they signed the contract with
6  anywhere in the country. The contracts, typically,
7  are there to define, you know, pricing.
8  So in my mind, doing a national contract
9  is probably establishing national pricing; whereas,
10 a local contract would establish pricing on a
11 location by location basis.
12 But in this particular instance, I
13 wouldn't know. I don't see any pricing on here, so,
14 on this one.
15 Q. When you say this one, just for the
16 record?
17 A. Exhibit 2.
18 Q. Going back to Exhibit 1, is this a
19 national contract?
20 A. I don't know. It doesn't specify
21 geography, I don't think, so. I would be assuming,
22 but I don't know for sure.
23 Q. What is your assumption?
24 MR. MARKS: I object.
25 A. I really wouldn't know, to be honest with

1  you because, I mean, it's governed by the laws of
2  the State of New York is the only sort of nexus,
3  geography I can discern reading it. So if I had to
4  assume, I would say it's based on the New York area.
5  That's the only geographic reference in here that I
6  could find other than the addendums, which they do
7  get into specific -- you know, like addendum on PA
8  0411 references Arizona Logistics. So in my mind,
9  that establishes Arizona as a geography. And PA
10 0406 establishes New York. But as for all the
11 states in between, I'm not sure if they wouldn't
12 fall under there because they don't have an
13 addendum. So I can't assume.
14 Q. What was Larry Brown's role in the
15 negotiation or approval of Exhibit 1, The Master
16 Client Services Agreement?
17 A. I don't know. He may have never seen it
18 or he may have been deeply involved. I don't know.
19 Q. Just to make sure the record is clear, did
20 you speak to Larry Brown to prepare for today's
21 deposition?
22 A. I did.
23 Q. Did you talk to him about his role in the
24 negotiation or approval of Exhibit 1, of the Master
25 Client Services Agreement?

1  A. Yeah, we discussed it. And I think at the
2  time I was talking to him, he couldn't recall,
3  didn't really say clearly, one way or the other,
4  whether he remembered how deep his involvement was.
5  He sort of just said, I don't know. It was 14 years
6  ago now.
7  Q. Did you speak to Larry Brown to prepare
8  for today's deposition about his role in the
9  contractor agreement, Exhibit 2?
10 A. I mentioned it to him. I don't think he
11 knew what I was talking about.
12 Q. Did he describe his role, at all, in a
13 later contract after the Master Client Services
14 Agreement with Parts Authority?
15 A. I'm sorry, could you repeat that.
16 Q. Did Mr. Brown discuss his role, in any
17 agreement with Parts Authority, after the Master
18 Client Services Agreement from 2010?
19 A. No, he did not.
20 Q. Did you ask Mr. Brown his role in the 2017
21 agreement with Parts Authority?
22 A. I asked him, you know, what's with that
23 other agreement. And he kind of didn't know what I
24 was talking about.
25 Q. Let's go to the interrogatory answers by

1  Arizona Logistics.
2  A. Okay.
3  (There was a brief recess.)
4  Q. (By Mr. Potashnick) Let's go back on the
5  record. I'd like to direct your attention to the
6  interrogatory responses by Arizona Logistics. Let
7  me know when you have those
8  A. I have it.
9  Q. Great. Let's call this Exhibit 3, please.
10 (The Court Reporter marked Plaintiff's
11 Exhibit 3.)
12 Q. (By Mr. Potashnick) is that your signature
13 verifying these interrogatory answers on the last
14 page?
15 A. Yes.
16 Q. I'd like you to take a look at
17 Interrogatory 7 and the response.
18 "Describe with particularity the
19 relationship between Norlyn Enterprises and each of
20 the following entities: NEL, ALI, BBB, MLI."
21 Do you recognize that as standing for
22 Northeast Logistics, Arizona Logistics, BBB
23 Logistics and Michigan Logistics?
24 MR. MARKS: Which number are you
25 talking about?

Page 37

1    MR. POTASHNICK: Seven.
2    MR. MARKS: "Identify all agreements
3    between Ariz. Logistics and any Parts
4    Authority entity or store"?
5    MR. POTASHNICK: I'm sorry, Number 8.
6    MR. MARKS: "Describe with
7    particularity the business relationship
8    between Ariz. Logistics and Norlyn
9    Enterprises."
10    MR. POTASHNICK: My apology.
11    Q. (By Mr. Potashnick) What did you mean by
12   "back offices services"?
13    A. All those things listed: Accounting,
14   billing, collection, finance, human resources,
15   information technology and so on.
16    Q. Does Norlyn provide those same back office
17   services to Northeast Logistics and Michigan
18   Logistics?
19    A. Yes, it does.
20    Q. What kind of human resource services does
21   Norlyn provide to those operating companies?
22    A. Recruiting new employees. I mean, the
23   general manager of, for example, Arizona Logistics,
24   since this is the one we are talking about, would do
25   the recruiting themselves locally, but the human

Page 38

1    resources people in Norlyn Enterprises would help.
2    You know, find resumés, those type of things.
3        If the general manager needed to
4    discipline an employee and was going to write them
5    up, the human resources department might help them
6    with that, either write it up for them or read what
7    they drafted. Or a termination, for that matter.
8        The human resources would actually
9    on-board a new employee. So they would -- for
10   instance, if any of the operating companies were to
11   hire a new employee, the human resources department
12   at Norlyn would provide the orientation package that
13   the employee -- would actually provide the
14   agreements that the employees would enter into
15   defining their role at the company, stipulating that
16   they are an employee and so forth. The paperwork,
17   you know.
18    Q. Does Norlyn provide the same human
19   resources functions, that you just described, to all
20   the operating companies that we talked about today?
21    A. Yes, it does.
22    Q. Does Norlyn keep pay records for the
23   delivery drivers at all the operating companies we
24   have discussed today?
25    MR. MARKS: I object. The pay

Page 39

1    record? What is the pay record?
2    MR. POTASHNICK: Records paid to the
3    delivery drivers.
4    A. The amounts that we pay the drivers are
5    maintained at Norlyn on behalf of the operating
6    companies.
7    Q. Does Norlyn maintain records of the work
8    days by the delivery drivers at all the operating
9    companies that we talked about today?
10    A. Does it maintain records?
11    Q. Yes.
12    A. Yeah. There is a central -- there is an
13   operating system -- each operating company actually
14   inputs the data. And so they are the ones creating
15   the data, but it is on a system maintained at
16   Norlyn.
17    Q. Do human resource people at Norlyn
18   participant in responses to delivery drivers'
19   complaints between the job?
20    A. No. Well -- no, they don't. Human
21   resource does not.
22    Q. Are the contracts with the delivery
23   drivers kept at Norlyn?
24    A. They are scanned and kept, you know, on a
25   server that is on the Cloud. So, actually, I think

Page 40

1    today they are signed so there is not ever really a
2    paper contract to be kept. When a general manager
3    contracts a new driver and they both sign the
4    contract, and you hit save, I guess you could say
5    it's maintained by the server that's owned by
6    Norlyn. So, yeah, it's kept at Norlyn.
7    Q. Does Norlyn provide any of these back
8    office services to any company that does not do
9    business as Diligent Delivery Systems?
10    A. No.
11    Q. In the response to Interrogatory 7, it
12   mentions "independent contractor resources." Wrong
13   document again. I meant Interrogatory 8. It
14   mentions "independent contractor resources."
15        Can you explain to me what is meant by
16   independent contractor resources, please.
17    A. That is a department of people that help
18   make sure contractors are properly contracted and
19   that any of their insurance and driver's license --
20   they may run a background check on a contractor.
21   And then they would help answer contractor questions
22   if they had a question about their settlement amount
23   that they were paid or if they had a question about
24   a complaint or if they didn't receive their 1099 or
25   something like that, they may ask the general

1  manager in the field.  And the manager in the field
2  would probably ask the independent contractor
3  resources departments to look into it.
4      Q.  When you said contractors in your answer,
5  were you referring to delivery drivers?
6      A.  Yes.
7      Q.  Who does Tony Carter report to?
8      A.  He's no longer an employee of Norlyn, but
9  when he was, he reported to Larry Brown.
10     Q.  Who has taken his position?
11     A.  Doak Medchill.
12     Q.  Who does Doak Medchill report to?
13     A.  Larry Brown.
14     Q.  Who does Camille Harvey report to?
15     A.  Doak Medchill.
16     Q.  Who is over accounting and bookkeeping for
17 the operating companies?  Is that you?
18     A.  Fe Cruz, the controller.  And she reports
19 to me.  So, I guess, by extension, I am too.
20     Q.  Is she over accounting and bookkeeping at
21 all of the operating companies we talked about
22 today?
23     A.  Yes.  For providing the accounting and
24 services for those companies, yes.
25     Q.  I may be close to done.  If we can take

1  ten minutes, I will try and wrap this up.
2      A.  Absolutely.
3          (There was a brief recess.)
4          MR. POTASHNICK:  We're back on the
5      record.
6      Q.  (By Mr. Potashnick) Who does Mark Stevens
7  report to?
8      A.  Doak Mudchill and Andy Van, sort of.  They
9  work together.
10     Q.  Does Mark Stevens report to Doak Mudchell
11 and Andy VanHaverbeke?
12     A.  Yes, VanHaverbeke.
13     Q.  Who does Andy VanHaverbeke's report to?
14     A.  Doak Mudchill.
15     Q.  Who does Brenda Soto report to?
16     A.  Larry Brown.
17     Q.  Who does Gina Volking report to?
18     A.  Fe Cruz.
19     Q.  Who do the general managers of the
20 operating companies, that we have been talking about
21 today, report to?
22     A.  Doak Mudchill.
23     Q.  Does Larry Brown have meetings with the
24 managers of the operating companies?
25     A.  Yes.

1      Q.  What is the purpose or topics of those
2  meetings?
3      A.  Primarily, to ask them about sales growth
4  and profitability.
5      Q.  When you talk about profitability, does
6  that include gross margin?
7      A.  Yes.
8      Q.  Does Diligent Delivery Systems consider
9  revenue, minus payments to delivery drivers, as the
10 gross margin?
11     A.  Yes.
12     Q.  Do the operating companies' revenues, that
13 you have been talking about today, go into a central
14 account or a joint account?
15     A.  Yes, it is a central account called a
16 sweep where the bank will -- if a deposit is made
17 directly into the operating company's account, the
18 bank automatically sweeps the monies out into a
19 master account to make it easier for treasury
20 management.
21     Q.  That master account includes funds paid to
22 Northeast Logistics, Michigan Logistics, BBB
23 Logistics and Arizona Logistics?
24     A.  Correct.
25     Q.  Who has control over that master account?

1      A.  The accounting department -- the signer on
2  the account is Larry Baker.  So if there was to be a
3  wire transfer out of that account, it would require
4  Larry's approval.  But normal day-to-day monies
5  moving in and out of the account are sort of
6  de-facto controlled by the accounting department
7  because they are the ones making the deposits and
8  writing the checks, either directly from that
9  account or to one of the other accounts, which is
10 going to impact that master account.
11     Q.  When you say the account department, is
12 that the accounting department at Norlyn Enterprises
13 at the home office?
14     A.  Correct, at Norlyn Enterprises.
15     Q.  Is that under the control of Fe Cruz?
16     A.  Yes.
17         MR. POTASHNICK:  That's all I have.
18     Thank you very much, Mr. Petty.  I really
19     appreciate your time and effort today.
20
21         (Signature was not waived.)
22
23
24
25

## Page 45

                    C E R T I F I C A T E

      I, Darla D. Thompson, CCR, RPR, and IL.
CSR, do hereby certify that pursuant to Notice there
came before me Darl Petty, who was by me first duly
sworn of his oath to testify to the truth of his
knowledge touching and concerning the matters in
controversy in this cause; that he was thereupon
examined upon his oath, and his examination was
taken in shorthand by me and later transcribed into
computer-aided transcription under my supervision,
and that the deposition is a true record of the
testimony given by the witness.
      IN WITNESS WHEREOF, I have hereunto
subscribed my name this 16th day of May 2021.



            Darla D. Thompson, CCR, RPR, IL. CSR

## Page 46

      I, DARL PETTY, hereby state that I have
read the foregoing questions and answers appearing
in this transcript of my deposition, and that this
is a true and accurate (corrected) report of said
answers given in response to the questions appearing
herein.


            DARL PETTY



      Subscribed before me this _____ day of
_____, 2021.


      My commission expires

## Page 47

TRANSCRIPT CORRECTION SHEET

Upon reading the deposition and before subscribing thereto, the deponent indicated the following changes:

(Any misspellings may be noted once with the notation to change throughout transcript.)

Page ___, Line ___, Should read:
Reason for change:

Page ___, Line ___, Should read:
Reason for change:

Page ___, Line ___, Should read:

Reason for change:

Page ___, Line ___, Should read:
Reason for change:

Page ___, Line ___, Should read:

Reason for change:


            SIGNATURE OF DEPONENT
(DDT)     BI-STATE REPORTING, INC
             (314) 805-6578

## Page -1

Page ___, Line ___, Should read:
Reason for change:

Page ___, Line ___, Should read:

Reason for change:

Page ___, Line ___, Should read:
Reason for change:

Page ___, Line ___, Should read:

Reason for change:

Page ___, Line ___, Should read:
Reason for change:

Page ___, Line ___, Should read:

Reason for change:

Page ___, Line ___, Should read:

Reason for change:

Page ___, Line ___, Should read:
Reason for change:


            SIGNATURE OF DEPONENT